NAUGHTON, Respondent, v. THE LACLEDE GAS-LIGHT COMPANY, Appellant.

St. Louis Court of Appeals, February 19, 1907.

1. **MASTER AND SERVANT: Safe Place to Work: Negligence.** In an action by the widow of a deceased employee for damages on account of his death caused by the negligence of his employer, where the negligence alleged was that the defendant put the deceased to work cleaning an ash pit under a boiler, knowing it to be a dangerous place, without instructing deceased as to its dangerous condition, and failing to make the

place safe for deceased to work therein by providing light and appliances necessary, the evidence is examined and held sufficient to make out a *prima facie* case for plaintiff.

2. ——: ——: **Assumption of Risk: Contributory Negligence.** Likewise it is held the evidence is insufficient to show conclusively that deceased assumed the risk of the injury he suffered or contributed to it by his own negligence.

3. ——: ——: ——. A servant does not assume a risk to which he is exposed by the failure of his employer to exercise ordinary care for his safety.

4. **PRACTICE: Evidence: Variance: Expert Testimony.** In an action by the widow of a deceased employee for damages on account of his death which occurred while he was removing ashes from the ash pit under a boiler in the defendant's factory, it was error to permit an expert witness on behalf of plaintiff to testify that it was bad management to allow ashes to accumulate under a boiler to the depth to which they had accumulated under the boiler in question, when the petition contained no assignment of negligence in allowing the place to become unduly dangerous, but the negligence alleged was in ordering the deceased into a dangerous place and failing to advise him properly and in failing to provide him with adequate safeguards while at work.

5. ——: ——: **Incompetent Testimony: Instruction.** The admission of incompetent testimony is prejudicial error though not alluded to in instructing the jury; testimony which jurors ought not to hear is presumed to influence their minds and constitutes reversible error, unless it affirmatively appears not to have had a prejudicial influence.

Appeal from St. Louis City Circuit Court.—*Hon. C. Orrick Bishop,* Judge.

REVERSED AND REMANDED.

*Seddon & Holland* for appellant.

(1)  (a)  The court erred in refusing to give the peremptory instruction offered by appellant at the close of all the evidence because there was no evidence to sustain any of the allegations of negligence contained in respondent's amended petition.  (b)  Because the evi-

dence failed to show that any of the alleged acts of negligence caused, or contributed to the cause of the death of Patrick J. Naughton. Breen v. Cooperage Co., 50 Mo. App. 203; Warner v. Railroad, 178 Mo. 125; Fuchs v. City of St. Louis, 167 Mo. 620; Oglesby v. Railroad, 177 Mo. 272; Epperson v. Postal Telegraph Co., 155 Mo. 346; Searles v. Railroad, 101 N. Y. 661; Dobbins, v. Brown, 119 N. Y. 188; Sorenson v. Pulp. Co., 56 Wis. 338; Priest v. Nichols, 146 Mass. 401; Smith v. Bank, 99 Mass. 605; Marble v. Worcester, 4 Gray 395. (c) Because this was clearly a case of assumed risk. Lee v. Railroad, 112 Mo. App. 372; Matthias v. Stock Yards, 84 S. W. 66; Holloran v. Iron and Foundry Co., 133 Mo. 470; Fugler v. Bothe, 117 Mo. 475; Steinhauser v. Spraul, 127 Mo. 541; Devitt v. Railroad, 50 Mo. 302; Cagney v. Railroad, 69 Mo. 416; Smith v. Railway, 69 Mo. 32; Price v. Railroad, 77 Mo. 510; Flynn v. Railroad, 78 Mo. 195. (2) The court erred in allowing respondent's witness, J. M. Wood, to give certain testimony in reference to the quantity of ashes that should be allowed to accumulate before the ash pit was cleaned out. (3) The respondent did not plead in her petition that the appellant was negligent in allowing too large an accumulation of ashes in the pit, and therefore it was improper to introduce this question into the case. The respondent was limited to the specifications of negligence contained in her petition. Hensler v. Stix, 108 Mo. 238; Mueller v. LaPrelle, 109 Mo. App. 506; Adolff v. Pretzel Co., 100 Mo. App. 199; Feary v. Railroad, 162 Mo. 75; Chitty v. Railroad, 148 Mo. 64; McMenamy v. Railroad, 135 Mo. 445; Waldheir v. Railroad, 71 Mo. 314.

*Dodge & Mulvihill* and *Johnson, Houts, Marlatt & Hawes* for respondent.

(1) The issue of defendant's negligence was properly submitted to the jury and their finding is amply supported by the evidence; so also was the question of cau-

sal connection between the negligence so found and the injury to plaintiff. (a) There was ample evidence of negligence of defendant in failing to properly light the ash pits and in furnishing the narrow boards for Naughton to lie or stand on while working. (b) The causal connection between the negligent acts of defendant and the injury in the case is a matter of fair inference for the jury from the facts shown. Hudson v. Railway, 32 Mo. App. 676; Buesching v. Gaslight Co., 73 Mo. 219; Settle v. Railway, 127 Mo. 326; Cambron v. Railway, 165 Mo. 326; Duggan v. Railway, 46 Mo. App. 268; Schultz v. Moon, 33 Mo. App. 340; 1 Thompson, Negligence, par. 161, p. 158. (2) The argument that the risk was assumed is without merit. (a) The negligence in this case consisted of a neglect of the master's duty to provide a safe place to work and suitable appliances with which to work. The servant cannot assume the risk of injury arising from such negligence on the master's part. Settle v. Railway, 127 Mo. 336; Pauck v. Beef Co., 159 Mo. 467; Curtis v. McNair, 173 Mo. 270; Cole v. Transit Co., 183 Mo. 81; Blundell v. Mfg Co., 189 Mo. 552; Stafford v. Adams, 113 Mo. App. 724; Dakan v. Mercantile Co., 94 S. W. 951; Obermeyer v. Logeman, 120 Mo. App. 59. (b). The facts show that Naughton neither knew nor understood and had no opportunity to know or understand the dangers to which defendant's negligence was exposing him. Therefore he could not assume the risk of injury from such dangers. Rigsby v. Supply Co., 115 Mo. App. 297; Lee v. Railway, 112 Mo. App. 373. (3) There was no reversible error in allowing witness Wood to testify as to proper depth of ashes in an ash pit. The instructions excluded such a statement from the consideration of the jury. McGinness v. Loring, 126 Mo. 410; Sidekum v. Railway, 93 Mo. 400.

GOODE, J.—This plaintiff is the widow of Patrick Naughton, deceased. While removing ashes from under a boiler in defendant's gas factory her husband was

burned so badly that he died four days afterwards. This action was instituted to recover $5,000 damages on account of his death, caused, it is charged, by defendant's negligence. At one of its gas factories in St. Louis defendant had six boilers about twenty-one feet in length, set side by side. Under each boiler was a furnace. These six furnaces were separated by brick walls twenty-two inches thick and fifty-one inches long. In the front or north end of each furnace was a fire box with a cinder box beneath and a grate on top. Behind the fire box and fifty-one inches back from the front end of the boiler, stood a brick wall built across the boiler and to within about a foot of its convex under surface. This partition was called the "Bridge Wall." Immediately behind the bridge wall was an ash pit or combustion chamber. This compartment was nine feet long, six feet wide and four and one-half feet in depth from the bottom of the boiler to the floor. Behind the ash pit was another transverse brick wall two and one-half feet high and behind it a chamber called the "mud drum," which was under the rear of the boiler and extended nine feet to its south end. It was about two feet in depth. When the furnace was in blast the flames streamed from the fire box in front, through the ash chamber and mud drum and thence to the flues in the rear of the boiler. The arrangement of the furnace and boiler will be understood from this cut:

EXHIBIT I.

The second chamber, that is, the ash pit or combustion chamber, would fill up with fine ashes carried by the draft from the fire box and dropped into it. Defendant had the ashes removed every six weeks, and testimony was received that this should have been done oftener, to the admission of which testimony an exception was saved. The ashes were very light and powdery and when stirred made a fog in the pit, rendering it difficult to see a person or object by the light of a candle. The boiler under which plaintiff's deceased husband was burned was an intermediate one, there being three furnaces on one side of it and two on the other. When a pit was to be cleaned the furnace in front remained without fire from forty-eight to sixty hours. The furnaces on the two sides of such pit were kept in blast continuously and the heat from them would penetrate the side walls and keep the ashes hot in the middle pit. The ash chamber was shut off from the daylight and was dark. The ashes in it were hot, "red hot" some of the witnesses said, and remained in that condition for as long as two months if the furnace on either side was kept burning. After the furnace in front of an ash pit had remained without fire for two days, or longer, one of defendant's employees would crawl over the grate bars, then over the bridge wall and through the opening between said wall and the bottom of the boiler into the ash pit. Usually all the ashes that could be, were dragged with a suitable tool out of the ash pit and into the mud drum. A man was then sent into the pit to shovel the remainder into the mud drum; but this method appears not to have been followed by the deceased and his fellow-workman on the occasion of the fatality; probably because they had had no experience in doing such work and were ignorant of the safest way to do it. Water from a hose would be thrown on the ashes until a crust was formed five or six inches thick and firm enough to support a man's weight when standing on a board laid on the sur-

face of the crust. The workman who was to throw the ashes from the chamber onto the floor of the mud drum in the rear, was supposed to stand or kneel on these boards while shoveling. Another workman in the open air outside the furnace chambers would drag the ashes thus thrown on the floor of the mud drum through a door in the rear. Candles cut in two were supplied to furnish light to the workman while he was in the pit; but the heat was so intense that a candle would melt after burning two minutes and for this reason the usual supply to light the place during one interval of shoveling, was seven or eight candle ends. The heat was so great that a workman could only remain in the pit ten or fifteen minutes when he would come out to cool and then go back or be relieved by another workman. Naughton had been in defendant's employ about two months before the day of the accident. His trade was that of blacksmith helper, and the evidence tends to show he had never cleaned out an ash pit until the day he was burned. Said work was generally intrusted by the defendant company to what is called the "pipe fitting department," but common laborers about the premises often assisted at the work. When any but an experienced hand was ordered to clean out the ashes in a chamber, some employee of experience was sent along to assist. A man named Charles Smith was foreman, and his brother John Smith vice-foreman. The latter, in the absence of his brother, told a workman by the name of Burnside to order Naughton and Robert Coleman to clean the pit under boiler No. 3. As one of the assignments of negligence is that Naughton was not instructed about how to do the work, we will give the substance of Coleman's testimony regarding the directions Burnside gave. The witness said Burnside told him and Naughton to clean out the ashes from under the boiler, that they walked over to the furnace together and he told Naughton that he (Coleman) did not know any-

thing about cleaning out the boiler; that he opened the back door and heard Burnside say to Naughton: "Smith said to get some boards to put in there. And when you go in there it will be hot, and you will have to take turns about going in there." Burnside swore he told Naughton to pull the ashes on top before going in so he could get in and showed him how to do so; told him to be careful to keep on the boards and there would be no danger if he did so; to wet the ashes good and come out when he got too hot. Naughton worked in the pit fifteen minutes before dinner and then came out to cool. After dinner he went in again and after working a while was heard to utter exclamations of pain. Coleman, who was at the rear of the mud drum raking the ashes out, became alarmed and told Smith, who was near, that Naughton was in trouble; at the same time saying he (Coleman) was going in after Naughton. Thereupon he crawled into the opening in the rear of the mud drum. He could not see Naughton on account of the dust in the ash pit, but it seems Naughton was trying to get out and had reached the opening between the ash pit and the mud drum where he fell prone. Coleman caught him by his hand but lost his grip because the flesh of the hand was cooked so that it slipped off the bones. Coleman got hold of him again and by that time Smith had come and the two pulled him out. Naughton was burned over more than half the surface of his body and died in a few days. Before dinner and after coming out of the ash pit, Naughton had turned the hose on the ashes to wet them. He was furnished with some boards, two inches thick, ten or twelve inches wide and four or five feet long (also some smaller boards) to stand or kneel on while at work. One of the boards was found after the accident, tilted up, and the inference was fair that it tilted while Naughton was on it and threw him into the hot ashes. There is testimony in the record tending to

show the boards would tend to tilt now and then in the process of removing the ashes.

The assignments of negligence in the petition are failure to instruct Naughton as to the construction of the boiler and ash pit and the condition of the ashes therein; failing to light the ash pit and the space thereabouts; failing to provide it with a hole or drum through which ashes could be removed without danger to employees; failing to supply tools and appliances by which the ashes could be removed without danger to employees; failing to provide suitable boards or other appliances on which to stand while removing the ashes and negligently ordering Naughton to work in a place known to be dangerous. The petition further avers that Naughton was not experienced in the work he was ordered to do, or acquainted with defendant's boilers and ash pits, or with the danger of working in the pit; all of which facts the defendant company knew, or by the exercise of ordinary care could have known. Defendant's answer was a denial of the allegations of the petition, a general plea of contributory negligence on the part of the deceased, without saying what negligence of his contributed to the casualty, and the further plea that all the surroundings amidst which Naughton was working were open and obvious and whatever danger existed in working there was known, or could have been known to him by ordinary care, and he assumed the risk of the work.

We think the statement of facts sufficiently answers the contention that plaintiff failed to make a prima facie case, and demonstrates that there is no merit in the assignment of error based on the refusal of the court below to direct a nonsuit on the ground of lack of evidence of negligence on the part of defendant, or that deceased was shown conclusively to have assumed the risk of the injury he suffered, or to have contributed to it by his own negligence. There is but slight if any, evidence that

Naughton was negligent and much evidence that defendant was in ordering him into a place of danger without proper instruction or safeguards. As to the alleged assumption of risk by Naughton, it is enough to say that if there was an omission of due care on the part of defendant, Naughton did not assume the risk to which he was exposed thereby nor waive the exercise of ordinary care by the defendant to insure his safety. [Blundell v. Elevator Co., 189 Mo. 552.] It is unnecessary to examine the instructions, for though we are reluctant to reverse the judgment, we are convinced, after a careful study of the question, that it must be reversed for an error committed in the admission of testimony. An expert witness was permitted to testify that it was not usual nor right management to allow ashes to accumulate under a boiler to a depth of more than five or six inches. An exception was saved to this testimony on the ground that the petition contained no allegation of negligence based on ashes having been allowed to accumulate in the pit to too great a depth before the deceased was ordered to remove them. The petition charges that ashes were allowed to accumulate until the pit was full of them and to remain there in an intensely hot state, thus rendering the pit a dangerous place to enter. Following this averment was an allegation regarding the occupation of the deceased and his lack of experience in the construction of boilers and cleaning out ash pits. Next comes an averment that defendant's foreman carelessly ordered Naughton into the ash pit to clean it out, when the foreman knew, or by reasonable care could have known of the intensely heated state of the ashes and that they made the pit dangerous. There can be no doubt that evidence was competent to show the depth of the ashes in the pit and their heated state, in support of the averment that the pit was a dangerous place to work. But defendant's counsel say that as the petition does not allege negligence in permitting the ashes to accumulate as deeply as they had, it was

error to receive testimony to show this was unusual and improper. It is perfectly plain from the petition that the assignments of negligence were ordering the deceased to work in a dangerous place, failing to advise him properly, and providing him with inadequate safeguards while he was at work, and that there was no assignment of negligence with regard to allowing the place to become unduly dangerous. Hence no issue was framed as to whether it was usual and proper to allow ashes to accumulate in the pit to a depth of three or four feet and defendant was not bound to be prepared with evidence to meet that charge. Perchance it would have found testimony to combat the testimony for the plaintiff that such an accumulation was unusual and bad management. As to this we do not say; but certainly the depth of the ash layer was not assigned for negligence and the testimony complained of was incompetent. Moreover, it was of a highly prejudicial character. One sees at a glance the effect on the minds of the jurors of proving three or four feet of ashes were in the pit when the deceased was ordered to work there; whereas, according to proper management, there should have been a layer not more than five or six inches deep. It is not argued that the evidence in question was competent; but plaintiff's counsel say it did no harm because the matter was not carried into the instructions, as the court submitted no issue regarding whether or not the ashes had been carelessly permitted unduly to accumulate, nor authorize a verdict for plaintiff if they had been. This argument is not a good answer to defendant's exception. Incompetent testimony may be and often is so prejudicial as to require the reversal of a judgment, though not alluded to in instructing the jury, nor made a ground of recovery. The rule is based on the presumed influence on the minds of the jurors of testimony which they ought not to have heard. The best practice is to object to irrelevant testimony when offered; not permit

it to go in unopposed and afterwards say a variance occurred. It is obvious that the testimony in dispute was very likely to induce the belief on the part of the jury that defendant had caused the death of the plaintiff's husband by a negligent omission of duty not charged in the petition; and the fact that it was not charged would be of no importance to the jury. When evidence is shown to have been incompetent and to have been erroneously admitted against the objection of a party, it constitutes reversible error unless it appears affirmatively not to have been of prejudicial influence. [Walton v. Railroad, 40 Mo. App. 544; Gunther v. Roy, 74 Mo. App. 597; Pryor v. Railroad, 85 Mo. App. 367.] We have scarcely a doubt that the testimony complained of told against the defense; for it went to show not only that the ash pit was a dangerous place, but that it had become so unnecessarily and against right usage.

The judgment is reversed and the cause remanded. All concur.

